Paul A. Lieberman, Esq.
Warshaw Burstein, LLP
555 Fifth Avenue, NY, NY 10017
N.J. Bar # 000000170781
212-984-7806
212-972-9150 (fax)
Attorneys for Plaintiff

RECEIVED

**JUL 1 7 2014**

AT 8:30_____ ___M
WILLIAM T WALSH, CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____X

ADAM M. PAIGE,

Plaintiff,

vs.

MERCEDES BENZ USA, LLC, DAIMLER, A.G., and
STEPHEN CANNON,

Defendants.

_____X

**COMPLAINT AND
DEMAND FOR
JURY TRIAL**

Civil Action No: $14$-$4516$
$(JLL)$

Plaintiff ADAM M. PAIGE ("Paige" or "plaintiff"), by and through his attorneys, alleges

as follows:

## PARTIES

1.    Plaintiff Paige, of Jewish origin and religion, resides at 140 Cadman Plaza

West, Apt. 14B, Brooklyn, New York 11201, and is a citizen of the State of New York.

2.    Defendant Mercedes-Benz USA, LLC ("Mercedes") is a foreign limited

liability corporation, which, upon information and belief, is incorporated in the state of

Delaware, and registered and authorized to do business in the state of New Jersey, with a

principal place of business located at One Mercedes Drive, Montvale, New Jersey, 07645.

{814786.8 }                                          1

3.     Mercedes is in the business of distributing and marketing Mercedes motor vehicles throughout New Jersey and the United States. Upon information and belief Mercedes is an affiliate, and/or a United States subsidiary, of defendant Daimler, A.G ("Daimler").

4.     Upon information and belief, defendant Daimler, located at 70546 Stuttgart, Germany, is a foreign corporation formed under German law, is a manufacturer of Mercedes-Benz motor vehicles, and is the parent corporation and/or affiliated corporation of defendant Mercedes.

5.     Upon information and belief, defendant Stephen Cannon ("Cannon") is the President and CEO of Mercedes, is a resident of New Canaan, Connecticut, and has his principal office at Mercedes' headquarters in Montvale, New Jersey.

6.     Plaintiff Paige brings this action against defendant Mercedes for wrongful termination and discrimination based on his Jewish religion and heritage in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et. seq. ("NJLAD"); against all defendants for wrongful termination in retaliation for his protesting the fraudulent, "rigged," and dishonest award of a multi-million dollar marketing contract to an unqualified vendor employer and related fraudulent bidding practices, and for protesting and exposing other fraudulent and/or illegal practices by defendants, in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et. seq.* ("CEPA"); and against all defendants for defamation.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action and the claims asserted in this complaint under 28 U.S.C. §1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

8.     This Court has personal jurisdiction over defendants Mercedes and

{814786.8 }                                                      2

Cannon because they are present in and regularly conduct business at Mercedes' headquarters located at One Mercedes Drive, Montvale, New Jersey 07645 and are thus subject to service of process in this state pursuant to Fed. R. Civ. Proc. 4.

9.     At all times relevant hereto, Paige was employed by defendant Mercedes at its corporate offices located at One Mercedes Drive, Montvale, New Jersey 07645.

10.     This Court has personal jurisdiction over Daimler because, at all times relevant hereto, Daimler sent employees from its "Business Practices Office" ("BPO") and "Corporate Security Operational Services" in Stuttgart, Germany, and from a U.S. located office in Michigan, to Mercedes' offices at One Mercedes Drive, Montvale, New Jersey, 07645, purportedly to investigate the business practices of various employees at Mercedes, including the plaintiff. Upon information and belief, Daimler recommended and/or participated in the wrongful decision that plaintiff's employment be terminated, as it exercises control over Mercedes' business policies, practices and procedures which are at issue in this case. Accordingly, plaintiff's claims against Daimler arose directly from Daimler's transaction of business in this jurisdiction and as such, Daimler is subject to jurisdiction in this Court and to service pursuant to Fed. R. Civ. Proc. 4.

11.     Venue is proper in this court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the events or omissions giving rise to the claim asserted in this complaint occurred within this judicial district.

## STATEMENT OF RELEVANT FACTS

12.     Beginning in or about 2008, and continuing until he was wrongfully terminated on May 22, 2013, plaintiff Paige was employed by Mercedes as a Department Manager of Brand Public Relations.

{814786.8 }                                   3

13.     In that capacity, plaintiff led the team responsible for creative public relations programming and media relations, promoting brand messages and Mercedes' automobiles across such key platforms as MB Fashion Weeks, sports sponsorships including the PGA Championship, Masters Golf tournament, the U.S. Open, and MB Football Superdome (specifically, the events surrounding the Super Bowl held in New Orleans, LA in February 2013).

14.     Prior to the events at issue here, plaintiff performed his job in a manner which met or exceeded the expectations of his employer.

15.     Plaintiff reported to Geoff Day, Mercedes' Director of Communications ("Day") and to Cannon, who was appointed President and CEO of Mercedes effective January 1, 2012, having previously been Vice President of Marketing for Mercedes.

16.     Upon information and belief, Day is the brother-in-law of the former CEO of Mercedes, Paul Halata, who, together with his son Mark Halata, owns a Mercedes dealership in Fairfield, California.

17.     Upon information and belief, Day was a favored employee at Mercedes who, with long-term impunity as set forth below in further detail, behaved improperly towards plaintiff in his position.

### A Culture of Rampant Anti-Semitism Existed At Mercedes:

18.     Day constantly belittled Paige and subjected Paige to anti-Semitic and defamatory remarks. Depending on his mood, Day would refer to Paige as his "good little Jew" or as "a bad Jew," supposedly based on Day's perception that Paige had disobeyed Jewish kosher dietary laws, and/or failed to obey Day's marching orders.

19.     Similarly, when Paige "jumped through hoops" to complete tasks that were not within his written job description, such as getting VIP's into popular clubs and restaurants as Day demanded, Day would refer to Paige as his "little Mitzvah." If Paige was not able to execute such extra activities, Day would belittle Paige stating, for example, "what am I paying you for if you can't get us in."

20.     Day had a particular fondness for publicly voicing inappropriate humor at the expense of Paige and other protected minority groups, for example, by changing the titles of regular movies into pornographic titles. Thus, "Schindler's List" -- a devastating movie about the harrowing survival of a group of Jews during the Holocaust -- became "Schindler's Fist."

21.     Day referred to Paige as a "dozy sod" and to Paige and other staff members as "dozy bitches," other female staff members whom he did not like as "useless cows" and German colleagues as "Nazis." At one press dinner, Day publicly humiliated and defamed Paige by telling the audience that Paige could "tell you where to get the best hookers and blow [i.e., cocaine]", an utterly false statement.

22.     Stephanie Zimmer ("Zimmer") , who lives near Monroe, N.Y., not far from Mercedes was, and upon information and belief, is, employed by Mercedes, and was promoted to Manager of Brand Experience in approximately May 2012. Zimmer is a close colleague of Cannon -- who had orchestrated Zimmer's promotion to replace the previous Manager of Brand Experience, Lisa Holladay, whom Cannon had pushed out from the position in or about March 2012. Zimmer routinely made derogatory remarks about Jews, including the very observant Jews she saw walking around Monroe and on the Montvale roads near Mercedes' offices, which are not far from communities which have large ultra-orthodox Jewish populations. Zimmer would opine on various negative characteristics that she believed Jews, including Paige,

possessed, stating for example, that "Jews (including Paige) are cheap." Zimmer referred to

Paige as a "showy Jewish American Prince." Such anti-Semitic behavior and utterances were

commonplace, pervasive and condoned by Mercedes and on information and belief, Zimmer,

despite her superiors being aware of her behavior was immune from sanction due to her being

protected by Cannon. This protective relationship also enabled Zimmer to work with others in

respect of improper awarding of contracts, as hereinafter described.

23.     In September 2012, CEO Cannon and VP of Marketing Bernhard Glaser

(who is not Jewish) deliberately, upon information and belief, scheduled an important off-site

marketing management meeting during the Jewish high holy day of Rosh Hashanah. Despite

Paige's protest, no change was made to the meeting date.

24.     While Paige was nominally excused from attending the meeting, he was

made acutely aware by his supervisor Day that his standing had suffered due to his non-

attendance.

25.     When Paige asked Day to de-brief him with respect to the meeting, Day

would not do so, advising Paige that "too much" had been discussed. Day also commented that

it was unfortunate that Paige had missed the meeting because he had lost the opportunity for

important "face" time with the company's executives. Paige should not have had to choose

between an important work meeting and observance of his faith.

26.     Upon information and belief, such anti-Semitism on the part of Mercedes'

employees, including, but not limited to, Day, Zimmer and Cannon, was quite commonplace and

frequently uttered -- sometimes quite loudly -- in the presence and hearing of quite senior

Mercedes' officers and employees, condoned and/or ignored by and is to be imputed to,

Mercedes, and in light of the apparent failure of the BPO to take appropriate action, is also to be imputed to Daimler.

27.     Upon information and belief, Paige was not the only Mercedes employee -- Jewish or not -- who was aware of, and perturbed by, the pervasive atmosphere of anti-Semitism at Mercedes, as exhibited by its executives including Day, Zimmer, and Cannon. For example, upon information and belief, in February 2009, during a Mercedes-Benz Fashion Week work event involving media, Day had slapped across the face Greg O'Shea ("O'Shea") (a team member) in front of Christine Chase (a Mercedes PR specialist) and several journalists, for reasons unknown. Several months thereafter, upon information and belief, O'Shea (who resigned from Mercedes -- upon information and belief, under pressure -- later in 2009) brought the incident to the attention of Mercedes' HR department and also filed a complaint with Daimler's BPO.

28.     Upon information and belief, in addition to complaining about being slapped by Day, O'Shea's complaint specifically raised Day's history and pattern of making anti-Semitic remarks, which O'Shea (despite not being Jewish) found offensive.

29.     Upon information and belief, despite this complaint by O'Shea, neither HR nor the BPO took any steps of major consequence to discipline Day for his anti-Semitic comments, or otherwise to address or remedy the anti-Semitic environment created by Day and other Mercedes executives.

30.     During the BPO's investigation of O'Shea's complaints, Paige -- who was interviewed as part of the investigation -- was specifically told by the BPO team that the BPO's true purpose and function was to "protect" the company from scandal and other adverse consequences.

**The Award of Lucrative Mercedes' Marketing Contracts To
An Unqualified, Inexperienced Vendor Whose Partner Was a Close
Personal Friend and Mentor of a Highly-Placed Mercedes Employee.**

31.     In or about the summer of 2012, Paige became aware that Mercedes was
issuing a Request For Proposals ("RFP") to the public to bid on a major contract for Mercedes
marketing services that would have a value of millions of dollars ("marketing contract"). Upon
information and belief, Cannon and Zimmer were responsible for the decision to bid out the
work covered by the marketing contract, and for the initiation and timing of the RFP process.
Prior to this time, that work had been performed by Sage Collective, LLC ("Sage"), whose
President was Jennifer Carper ("Carper") until in or about July 2012 -- *i.e.*, approximately the
same time that Mercedes started its RFP process.

32.     Upon information and belief, in the course of the RFP and bidding
process, Zimmer improperly shared confidential inside, proprietary information about Mercedes'
business practices, marketing plans, budgets, and strategy with Carper. Carper was Zimmer's
close personal friend and mentor, who had recently left or was in the process of leaving Sage --
for purposes of corrupting the bidding process and perpetrating a fraud upon all the bidders
except one favored bidder, a new company known as the Engine Shop Agency ("Engine Shop"),
which Carper intended to join if and when it was awarded the marketing contract. Zimmer's
intention in sharing such confidential proprietary information with Carper was, as detailed
below, to "engineer" the award of the marketing contract to Engine Shop for the personal benefit
of both herself and Carper.

33.     Upon information and belief, Sage, which had previously performed the
marketing work which was the subject of the RFP, was founded some years earlier, with Carper
as its President, and was part of the Radiate Group, a subsidiary of Omnicom Group Inc.

{814786.8 }                              8

("Omnicom"). Upon information and belief, after Carper left Sage in or about July 2012, she worked as an independent marketing consultant -- including for Mercedes, and in connection with the RFP process -- formed her own company (Eclipse Marketing LLC, formed on or about August 9, 2012) for that purpose.

34.     Engine Shop is a sports, lifestyle and entertainment marketing agency founded, upon information and belief, by Ed Kiernan ("Kiernan") and Brian Gordon ("Gordon") in or about February 2012.   Upon information and belief, at the time of its bidding on the multi-million dollar Mercedes contract only about six months later, Engine Shop had virtually no institutional experience or staff to carry out the work for which it was bidding.

35.     Before founding Engine Shop, Kiernan had worked for GMR Marketing, also part of the Radiate Group.  Upon information and belief, Kiernan (based in Naples, FL) and Carper (based in Ponte Verde Beach, FL) had previously worked together.  Moreover, upon information and belief, both Kiernan and Carper had connections to the Professional Golf Association ("PGA").  In fact, upon information and belief, Kiernan's first job out of college was with the PGA Tour's Championship Management Company, which oversaw activities for many tournaments including the Mercedes-Benz Championship in Kapalua.

36.     Upon information and belief, Gordon (Engine Shop's other founding partner), who had previously worked for Miami Marketing Group, also knew Carper.

37.     In addition, upon information and belief, Carper had close ties to Cannon, including through her work for Mercedes while she was at Sage, primarily when Cannon was Vice President of Marketing for Mercedes prior to becoming President and CEO at the beginning of 2012.

38.     Carper also had close ties to her friend Zimmer, who had worked at Mercedes as a Sports Marketing and Consumer Events Supervisor from approximately 2007 until she became a Brand Experience Manager in or about May 2012. In fact, upon information and belief, Zimmer owed her promotion to that position to Carper: after Cannon pushed Zimmer's predecessor (Lisa Holladay), out of Mercedes in or about March 2012, Carper successfully advocated with Cannon for Zimmer to get the position of Brand Experience Manager.

39.     Upon information and belief, Carper knew, from her previous dealings with Mercedes while she was at Sage, that if Zimmer were promoted to Brand Experience Manager, she would, by virtue of that position, have the ability (along with Cannon) to put the work covered by the marketing contract out for bidding, and to control the initiation and timing of the RFP process. Accordingly, upon information and belief, Carper advocated with Cannon to promote Zimmer to the position of Brand Experience Manager not merely out of friendship, but in order to put Zimmer in a position where she could assist Carper with obtaining the Mercedes business for Engine Shop once Carper left Sage. Upon information and belief, Carper's assistance to Zimmer in obtaining that promotion was (among other things, as alleged below) part of the benefit or *quid pro quo* which Carper provided to Zimmer in exchange for Zimmer's help with her scheme to obtain the Mercedes business for herself and for Engine Shop.

40.     Upon information and belief, at or about the time of Engine Shop's formation in February 2012 -- shortly after Cannon was appointed as Mercedes' President and CEO, and shortly before Cannon promoted Zimmer to Brand Experience Manager at Carper's recommendation -- Engine Shop's principals embarked upon a plan or scheme with Carper for Carper to leave Sage and to use her connections with Mercedes (including, specifically, with

Zimmer and Cannon) to bring the Mercedes business (along with certain Sage employees) to Engine Shop, in exchange for a senior position with Engine Shop if she succeeded.

        41.     Upon information and belief, Carper informed Zimmer of her intentions, and Zimmer (who owed her promotion to Carper) agreed to assist Carper in that scheme -- with knowledge of Carper's plans to leave Sage and try to obtain the Mercedes business for Engine Shop by using her influence with Mercedes personnel, including Zimmer -- by illegally providing Carper with inside information about the RFP process that she could use to ensure that Engine Shop would be the winning bidder, in exchange for benefits provided by Carper to Zimmer. Such benefits included the benefit which Carper had provided to Zimmer in arranging with Cannon for Zimmer's promotion to the position of Brand Experience Manager in the first place (a promotion that enabled Zimmer to assist Carper), as well as other benefits described below.

        42.     Upon information and belief, in furtherance of this arrangement, Zimmer, among other things, effected the retention of Carper as a Mercedes consultant, facilitating Zimmer's ability to share with Carper -- as she proceeded to do -- confidential inside information about Mercedes' business practices, marketing plans, budgets, and strategy. Upon information and belief, Zimmer also coached Carper (and Carper's future Engine Shop team) on how Engine Shop should approach and position itself with Mercedes' executives at business meetings to ensure that Engine Shop would win the lucrative marketing contract, which it did. Such conduct was a fraud upon other prospective bidders for the work -- a fraud which, upon information and belief, Cannon, Mercedes' President and CEO, willingly and knowingly countenanced.

        43.     Upon information and belief, Zimmer provided such inside information to Carper about Mercedes during the RFP and bidding process knowing that although Carper was

11

acting (in theory) as a consultant for Mercedes at the time -- and was charging Mercedes for her services -- she intended to and did provide such special information to Engine Shop, and otherwise use the information to enable Engine Shop to defraud and gain an advantage over any and all other bidders for the contract and win the bid.

44. Upon information and belief, Zimmer also knew, when she provided such proprietary information to Carper, that Carper intended to join Engine Shop (as she did) after it was awarded the marketing contract by Mercedes (on the assumption that it would be the winning bidder, as it was). In fact, upon information and belief, Zimmer also knew at the time that Carper had, while still a Mercedes consultant, already negotiated (or begun to negotiate) an executive or partnership position with Engine Shop, to take effect after the contract was awarded and Carper had successfully brought the Mercedes business to Engine Shop. Upon information and belief, all of Carper's actions in procuring the marketing contract for Engine Shop were taken with her friend Zimmer's knowledge and approval, and could not have been carried out without Zimmer's active participation, assistance and collusion.

45. Moreover, not only did Cannon have a close working association with both Zimmer and Carper as alleged herein (including to Cannon's own personal benefit; *see* ¶¶ 59-60 and 70 below), but he continued to be directly and heavily involved, on a "hands-on" basis, in Mercedes' marketing activities even after he was promoted from VP of Marketing to President and CEO as of January 1, 2012. This was particularly the case with respect to major decisions and processes as to which millions of dollars of Mercedes' marketing money were at stake, such as the decision on which agency should be awarded the marketing contract through the RFP process. Upon information and belief, the improper actions of both Carper and Zimmer

with respect to the RFP process were undertaken with, and could not have been successfully implemented without, Cannon's knowledge and acquiescence.

46.     Upon information and belief, in at least one meeting in or about the fall of 2012, Zimmer assured her staff that Engine Shop would be the successful bidder over all the other companies who had submitted RFP's on the project, notwithstanding its lack of experience.

47.     As a result of the foregoing improper, fraudulent and illegal conduct, Engine Shop was awarded the marketing contract by Mercedes in or about December 2012, with the contract to take effect as of January 1, 2013 -- a decision approved by Cannon, who, given the monetary size of that contract, was required under Mercedes policies to authorize the contract award.

48.     Upon information and belief, Carper not only disclosed to Engine Shop the confidential inside information which Zimmer had provided to her, but -- well before the marketing contract was awarded, when she was still a Mercedes consultant -- actually began working with Engine Shop in making preparations for carrying out the contract after its expected award (a clear violation of internal Mercedes policy). Moreover, Carper began working directly with Engine Shop in carrying out Engine Shop's duties under the marketing contract as soon as that contract took effect, in connection with Mercedes-sponsored events such as the Super Bowl and Fashion Week events in early and mid-February 2013, even though she did not officially join Engine Shop until late February 2013.

49.     Thus, upon information and belief, as a result of her instrumental role in procuring this wrongfully obtained marketing contract for Engine Shop, Carper was made a partner and Chief Client Officer at Engine Shop in late February 2013 (as publicly announced by

Engine Shop on or about March 4, 2013). Upon information and belief, Carper also "raided" Sage and brought several key Sage employees to Engine Shop.

50. Upon information and belief, as alleged above, Carper's position with Engine Shop was the *quid pro quo* from Engine Shop which she had intended and expected from the outset of the RFP process, and had arranged with Engine Shop to receive for her efforts on Engine Shop's behalf -- efforts which began long before she formally joined Engine Shop, then continuing throughout her tenure as a Mercedes consultant, with Cannon's knowledge, and Zimmer's knowledge and assistance.

## Paige "Blows Whistle" on RFP Misconduct

51. Once it became evident to Paige, in the fall of 2012, that the RFP process was a *fait accompli*, and that the marketing contract was going to be awarded to Engine Shop (a conclusion he drew from the fact, *inter alia*, that Carper was already working with Engine Shop on a *de facto* basis while purportedly still acting as a Mercedes consultant, long before she formally joined Engine Shop as of March 4, 2013), Paige protested -- and continued to protest -- the award of the marketing contract to Engine Shop. He articulated his protests to his supervisor Day and to others.

52. Among other things, Paige stated to his superiors and others that it was improper for Carper to be able to divert business and staff from her former employer Sage and deliver it to Engine Shop, and for Zimmer to help orchestrate that result (to the detriment of Mercedes and other bidders) -- a result based, upon information and belief, on inside information which Carper received from Mercedes personnel (specifically, Zimmer). Paige complained, *inter alia*, that Carper had a direct conflict of interest in acting as a consultant to Mercedes, advising Mercedes to hire Engine Shop, while at the same time, she was also arranging for her

{814786.8 }                                            14

own employment with Engine Shop. Indeed, upon information and belief, Carper's insider knowledge of specific Mercedes budget opportunities helped Carper to negotiate her salary and position with Engine Shop based on revenues that she knew Engine Shop was likely to receive from the marketing contract in 2013.

53.     Paige continued to protest this award of the marketing contract to Engine Shop after it had occurred, challenging decisions made by Zimmer and Carper regarding Engine Shop. For example, at one internal manager development program, in front of other managers including Matthew Messinger, Paige raised the fact that he was having major problems with Zimmer and her inability to countenance or even consider negative comments concerning Engine Shop's work.

54.     Paige also confided in Jasmine Golubic, who directly reported to Zimmer, that he was having major problems with Zimmer in connection with her involvement with Engine Shop, including, without limitation, with respect to Carper's and Engine Shop's poor execution of events held in connection with the Super Bowl and Fashion Week in February 2013, including the ESPN Super Bowl party -- all of which complaints concerning Engine Shop's lack of competence directly implicated the legitimacy of the RFP process. Upon information and belief, Golubic disclosed Paige's complaints to Zimmer, who, in turn, brought them to Cannon's attention.

55.     Upon information and belief, Day also raised issues concerning Carper's and Engine Shop's poor execution of such events, and, immediately thereafter, was threatened by Carper that she would use her influence to "go after him" (and, implicitly, Paige as well).

56.     Similarly, Paige vigorously challenged Zimmer, among others things, about the hiring of Engine Shop's sister agency, Platinum Rye Entertainment ("Platinum Rye"),

to perform certain entertainment-related marketing business for Mercedes. Platinum Rye had no experience, for example, with logistical storing and loaning of vehicles to television and motion picture studios, which comprised an important component of the business to be awarded to Platinum Rye. Paige believed that the then-current vendor, Vista Group, which had a 20 year relationship with Daimler, should continue to be the vendor, and, given Paige's challenge, Zimmer reluctantly kept Vista Group as vendor.

57.     However, in a demonstration of Zimmer's general confidence that even though she was not Paige's superior, she would prevail in any dispute between them given her close business relationship and influence with Cannon, when Day suggested to VP of Marketing Glaser, in the late fall of 2012, that Paige should run the Entertainment Ambassador marketing function (which had previously been Zimmer's responsibility, and for which she intended to use Platinum Rye as the vendor), Zimmer confronted Paige and said to him "there is no way you are taking this from me." Despite the fact that Day -- Zimmer's superior -- supported the transfer or responsibility from Zimmer to Paige, Zimmer prevailed (upon information and belief, because of her influence with Cannon) and the function remained with her.

58.     Paige's protests concerning the decision to award the marketing contract to the unqualified Engine Shop went unheeded, but brought negative attention to him, not only from Carper and Zimmer (with whom Paige had directly discussed his concerns), but also from Cannon -- who, upon information and belief, had learned of Paige's complaints from Day, as well as from Zimmer and/or Carper.

59.     Upon information and belief, Zimmer, Carper and Engine Shop enjoyed special, protected status at Mercedes by virtue of having performed inappropriate favors for CEO Cannon, including, but not limited to, arranging for Cannon's niece and her friend to attend

various Mercedes functions including an event during Mercedes-Benz Fashion Week in September 2013; arranging for Cannon's daughter to attend the Aspen Ideas Festival in 2011 at a cost to Mercedes of $7,500; and arranging for Cannon's closest friend to attend the Super Bowl (and associated events) in February 2013. Such personal favors to Cannon were a clear violation of internal Mercedes company policy as they served no business purpose whatsoever.

60.     Upon information and belief, such favors comprised a component of the *quid pro quo* provided by Carper to Cannon for his approval of, and acquiescence in, Zimmer's improper and deceptive conduct in connection with the award of the marketing contract to Engine Shop. Given that both Zimmer and Carper handled requests from Cannon for personal favors that violated internal Mercedes policies as alleged above, Cannon, upon information and belief, ensured that both Zimmer and Carper got what they wanted -- whether because he wanted to reciprocate and/or because he believed they had a "hold" over him -- and, accordingly (among other things), signed off on the lucrative award of the marketing contract to Engine Shop, worth millions of dollars in Mercedes business.

61.     In addition, upon information and belief, Zimmer herself received various benefits and inducements from Carper in exchange for enabling Engine Shop, through Carper, to be the successful bidder for the Mercedes marketing contract, in addition to Carper's successful efforts to persuade Cannon to promote Zimmer to Brand Experience Manager in or about May 2012. Upon information and belief, such additional benefits and inducements included, without limitation, Carper's execution of certain aspects of Zimmer's work for her, on a continuing basis both before and after Engine Shop was awarded the marketing contract. The tasks performed by Carper for Zimmer ranged, upon information and belief, from Mercedes-Benz Fashion Week sponsorship contract negotiations, to drafting (*i.e.*, ghostwriting) letters and memos for Zimmer.

Carper also prepared presentations on behalf of Zimmer for Mercedes' executive management.

62.     Upon information and belief, Zimmer needed Carper's assistance with such tasks because, given her inexperience at her position as Brand Experience Manager -- to which Cannon had promoted Zimmer only a short time before the RFP process in question began -- she was "in over her head" with respect to many of the tasks required by that position, which she had never previously performed, but for which Carper was able to provide assistance to her (and/or actually perform that work for her).  Pursuant to Mercedes procedures, Senior Managers meet to consider whether a given candidate for promotion should be so promoted.  On information and belief, the Senior Management team which convened in respect of Zimmer was, in fact, reluctant to recommend that she be promoted due to her various deficiencies in skills and she only received the promotion because the Senior Management team did not want to oppose the wishes of Cannon, the Chief Executive Officer.

63.     As alleged above, when it was time for Carper to "cash in" on the benefits she provided to Zimmer (including Carper's role in persuading Cannon to promote her), Zimmer helped Carper/Engine Shop with the overall procurement and bidding/proposal process, providing the knowledge and inside information that gave Engine Shop an unfair and fraudulent advantage over other bidders.

64.     All of the *quid pro quo* arrangements alleged above constituted commercial bribery under the New Jersey Commercial Bribery Act, N.J.S.A. 2C:21-10(a).

65.     In short, Zimmer and Cannon arranged the award of the lucrative marketing contract, worth millions of dollars per annum, to a company (Engine Shop) in which they knew that Carper, a friend and/or long-time associate (as well as a Mercedes consultant), was about to become a principal.  Such conduct -- including privately sharing crucial,

confidential background information with Carper (for the use of Engine Shop but not for the use of other bidders), which Carper proceeded to hand to Engine Shop, but not to rival bidders who received no such "inside information" and were thereby disadvantaged -- created a conflict of interest which fatally and irrevocably tainted and "rigged" the bidding process. The process was fraudulent with respect to such rival bidders, and, separately, constituted commercial bribery in light of the benefits which, upon information and belief, Zimmer gained from Carper (both before and after the award of the marketing contract) for helping orchestrate this scheme, as well as the benefits obtained by Cannon in the form of personal favors as alleged above.

66.     Paige took offense to all of this, and reported it and discussed it with Day and others in the office, on multiple occasions, before he was terminated -- to no avail and with no effect other than his own retaliatory discharge by defendants.

## The Sham Investigation of Plaintiff by Mercedes and Daimler.

67.     In or about the first week of April 2013, Cannon met with Paige. He asked Paige "who he thought he was." Cannon stated that Mercedes was questioning various bills that had been submitted by Paige to Day and approved by Day for the group's entertainment expenses during past marketing events. In fact, as Paige explained to Cannon, all of Paige's reports were entirely accurate as he prepared them (although, on one occasion, Day directed his administrative assistant to remove his name from an expense report which Paige had prepared in connection with Fashion Week in February 2013 because, for reasons unknown, Day did not want it known that he had attended the event).

68.     Furthermore, none of Paige's reports reflected excessive spending by Paige, as Paige explained and demonstrated to Cannon. Among other things, Paige reminded Cannon of certain duties and requirements inherent in his job (and even included in his written

job description), with which Cannon may not have been immediately familiar. Thus, Paige's very job was, in large part, to entertain, and thereby to inculcate friendship and good will with, the journalists on whose favorable reviews and comments Mercedes' marketing substantially depended. Accordingly, Paige's entertainment expenditures, as reflected in his reports, were both standard and reasonable.

69. Cannon also focused on Day, asking Paige if Day "was hiding things" or "playing games" with expenses, and opined that Day "was under the microscope." Paige explained that Day -- rather than Paige himself -- was, as Paige's supervisor (who was present at a number of the events in question), the person responsible for any possible issues regarding purportedly excessive expenses.

70. In fact, upon information and belief, it was Cannon himself who played "games." Examples of his improprieties, contrary to Mercedes rules and policies, include, as alleged above, Cannon's bringing his daughter to a Mercedes sponsored event called Aspen Ideas Festival, at which his daughter used a ticket paid for by Mercedes-Benz worth $7,500. In addition, Cannon directed that Mercedes company vehicles be sent to his home in Connecticut for use by his children. Cannon also provided Zimmer with permission to bring her husband and friends to a major golf event sponsored by Mercedes.

71. Ominously, after Paige's initial meeting with Cannon, Day told Paige that if "heads were going to roll," it will be "you [Paige]" and not "me [Day]," who would be gone. In fact, Day often gloated that he was "untouchable," and was particularly pleased that while he was the one who slapped O'Shea, it was O'Shea who had been pressured to leave the company and ultimately had to resign.

72.     Shortly thereafter, on April 10, 2013, Paige (who knew that Day had also met with Cannon, also ostensibly about excessive expenses) asked Day, "is it my head?" Day said "yes." On the same day, Paige was summoned to the HR Department and was abruptly told by Sarah Appio of HR, in a meeting at which Day was initially present (but said nothing) that it was indeed Paige, and not Day, who was being let go for "cause," due to purported "excessive spending." Paige was to be terminated immediately without severance or benefits.

73.     However, after further conversation between Paige and Appio during that meeting about Day's purchasing abuses (including Paige's pointing out that many of the purportedly excessive expenditures were Day's, not Paige's) -- a discussion for which Day left the room -- and given the accuracy, timeliness and transparency of Paige's own expense reports, as well as Mercedes' and Day's knowledge and acceptance of such reports, HR (apparently or ostensibly) reconsidered. After Sarah Appio left the room to discuss the situation with Renato Razon, her superior, she and Razon returned, and advised Paige, during the very same meeting on April 10, 2013, that instead of being terminated for cause, he was temporarily being suspended with pay, pending further investigation.

74.     Upon information and belief, defendants realized that the "excessive spending" justification for terminating Paige was insufficient to hold water or be credible, and that another reason would have to be found -- while, at the same time, additional information could be gathered to force  the resignation of Day, who also had complained about Engine Shop and, upon information and belief, had thereby (as well as for other reasons) run afoul of Zimmer, Carper, and Cannon.

75.     Thereafter, Paige cooperated fully with employees from Daimler's Business Practices Offices and security division, including one of Daimler's employees from

Germany -- Herr Stefan Geromüller, of Stuttgart, Germany, who was in Michigan and New Jersey during the relevant time period on Daimler's behalf, and/or Mercedes' behalf, and who investigated and met with Paige concerning these issues.

76.     Paige cooperated with respect to the subject matter of the investigation, notwithstanding his knowledge that whistleblowers were discouraged, retaliated against, and/or lost employment at Mercedes, for reporting wrongdoing.

77.     For example, upon information and belief, prior to Paige's termination, a Mercedes employee, Alexa Harnett, had complained to the BPO about the misuse of Nike gift cards by Zimmer. Rather than being commended, her employment was terminated. It was ultimately only restored through the extraordinary intervention of the then-President of Mercedes, Ernst Lieb.

78.     Such conduct on the part of Mercedes had the effect of "chilling" any efforts of employees to report violations of policy or procedure.

79.     Paige was questioned about expenses primarily related to public relations and marketing events that Day's group, which included Paige, had travelled to and in which Paige had participated.

80.     Questions arose, for example, about the appropriateness of a bill for a car service for Paige's wife to attend a Mercedes event, notwithstanding that Day had ordered the wives of his team to participate, and the fact that Paige demonstrated to the investigators, Mercedes and Daimler, that he had taken the family's only car to the event the day before, leaving his wife behind in New York without means of transportation.

81.     In response to concerns over why Paige had sometimes paid for liquor, food and other such expenses at client events with his own company-provided credit card --

instead of having the most senior person present (such as Day) pay the bill, which was Mercedes' purported policy -- Paige demonstrated that Day, plaintiff's supervisor, had attended these events but had refused to pay. In fact, Day often claimed that his credit card was "maxed out," forcing Paige to pay.

82.     Indeed, Paige witnessed and informed Daimler's Business Practices Office that this appeared to be a frequent corporate practice at Mercedes notwithstanding any purported internal control policies to the contrary. For example, in July 2012, the VP of Marketing, Bernhard Glaser, and the very President and CEO of Mercedes, Cannon, attended a dinner and only paid for their own table's charges, not for Paige's table, despite being senior to Paige. Similarly, in January 2013, Glaser again witnessed Paige's paying for his table's charges -- but, despite being the most senior person present, did not attempt to pay the check for Paige's table and instead said nothing. Thus, apparently, neither the President/ CEO, nor the VP of Marketing, believed it was a violation of Mercedes' policy -- or did not care if it were -- to have Paige pay for his table's expenses even though they, his superiors, attended the same function.

83.     At one point, when plaintiff's credit card was "maxed out" and the charges were denied, yet another team member had to pay the bill. When Paige raised this incident during the inquiry, Mercedes'/Daimler's disingenuous response was to query why Paige did not get his credit card limit increased or use his personal credit card for thousands of dollars of expenses. Clearly, non-compliance by superiors was condoned while Mercedes/Daimler disingenuously tried to shift the burden to a junior person.

84.     Similarly, Paige provided information regarding the details and whereabouts of a painting and other articles purchased by Day at an amfAR charity auction event and at an Amelia Island Concours charity auction event, both held in 2010, at a cost of nearly

{814786.8 }

23

$20,000 overall -- approximately $10,000 for the painting alone.  Upon information and belief, as Paige explained to the BPO, Day had bid on and won these items at the auctions, and had billed the purchase prices to Mercedes -- but, after the items were delivered (and even though they were paid for by Mercedes), kept the items for himself.

85.     At the amfAR auction, after Day purchased the painting, he directed Paige to sign for it -- which Paige did, but informed the Mercedes purchasing department of all the specifics of the purchase.  Upon information and belief,  Defendants initially believed that Day not only kept the painting for himself but took it home with him from Mercedes' offices, but upon Paige's repeating his explanation of what had happened, that because Paige had signed for the painting (at Day's direction) after Day had purchased it at the amfAR auction, defendants at some point determined that Paige was somehow responsible for, or had knowledge of, the painting's absence from Mercedes' offices.   However, on information and belief, the painting was found in Mercedes' mailroom.

86.     Upon information and belief, Paige's disclosure of this information -- that Day had billed nearly $20,000 to Mercedes, resulting in payment by Mercedes, for items including a painting that he had kept for himself -- raised serious and far-reaching tax implications as to the accuracy of (and possible illegalities in) not only Day's own tax returns (and the W-2 issued to him by Mercedes), but those of Mercedes itself.

87.     Paige also brought to the attention of Mercedes' legal counsel, Marco DeSanto, the fact that Mercedes was paying more than $30,000 to rent a house at a Master's Golf Tournament to house Cannon, an expense that appeared extreme to Paige, but one that was apparently tolerated without protest.  Upon information and belief, it was standard practice for Engine Shop (the marketing agency then under Zimmer's management), through Carper, to make

such arrangements to gain favor with Cannon, an avid golfer, who was the person who stayed at this expensive venue rented by Mercedes.

88. Thus, Paige cooperated fully with the BPO's investigation of such issues relating to purportedly excessive spending (an investigation that, at the time, appeared to be targeting Day rather than Paige himself). However, as alleged above, Paige knew that there was a history at Mercedes of retaliatory action taken against employees who had raised non-anonymous complaints with the BPO which were far less significant than the complaints Paige had already made to Day and others regarding the award of the marketing contract to Engine Shop -- complaints which implicated not only Zimmer but Cannon, Mercedes' President and CEO, and which, upon information and belief, had already brought adverse attention to Paige from Zimmer and Cannon, effectively making him a "marked man."

89. Therefore -- and particularly given what Paige had been told in 2009 with respect to the BPO's true function being the "protection" of the company -- Paige was extremely concerned that if he went beyond the subject matter of Day's excessive spending, and brought up the Engine Shop issues to the BPO during the investigation, his job would be placed in further jeopardy than already appeared to be the case as a result of his "paid suspension" status. In light of those concerns, Paige decided not to bring up again, to the BPO in its investigation, his previous Engine Shop complaints (although those issues had already been thoroughly aired with Day, his supervisor), unless the BPO itself raised such issues -- which it chose not to, for reasons unknown. As it turned out, however, Paige's caution did not protect him from retaliation for the complaints he had already made concerning Engine Shop.

90. Ultimately, notwithstanding Paige's full cooperation with the BPO's "excessive spending" investigation, and his demonstrated integrity, he was suddenly advised by

{814786.8 }                                      25

Sarah Appio of Mercedes' HR department, in a telephone conversation on May 22, 2013, that he was being "let go."

91.     When asked for the reason, Ms. Appio confirmed that Paige had cooperated fully with the investigation and that Mercedes did not have a problem or issue with Paige's level of spending after all.

92.     However, Ms. Appio stated that Paige was being terminated by Mercedes, in essence, because he purportedly did not complain early enough about Day's misuse of "travel and entertainment" expense practices, which were in purported violation of Mercedes' nominal policy, in that Day required Paige to pay for entertainment expenses when Day, who was the most senior person attending the event, should have done it. Thus, and as further alleged below, the purported grounds for Paige's termination were transparently fictional and a pretext.

93.     Amazingly, in conduct that comported with Mercedes' practice and policy, as alleged above, of punishing those who report wrongdoing rather than the actual offenders, Paige thereafter learned that Day, whose wrongdoings Paige supposedly failed to report soon enough to Mercedes, was not losing his position at that time. Day did not leave Mercedes until he resigned, effective on or about August 1, 2013 -- upon information and belief, under pressure but with a substantial severance payment consisting of a year's pay and all or most of his benefits intact, including being provided with a car.

94.     Upon information and belief, defendants' disparate treatment of Paige and Day -- firing Paige with no severance, while permitting Day to resign months later and giving him a substantial severance payment plus benefits, even though the conduct which was the ostensible ground for Paige's termination was Day's rather than Paige's (and even though Day,

as well as Paige, had complained about Zimmer's involvement with Carper and Engine Shop)` -- was attributable, in whole or in part, to the anti-Semitism alleged above.

95.     Although the Mercedes/Daimler investigation of Paige was purportedly confidential, after it had been concluded and Paige had been terminated, Paige was separately told, by Day and by Tobias Mueller ("Mueller"), a Mercedes employee, that various Daimler and/or Mercedes personnel had advised them that Paige supposedly lost his job because he had allegedly served alcohol to an underage minor, in violation of the law -- specifically, the model and actress Kate Upton -- during a pre-Super Bowl party taking place directly after a party sponsored by Mercedes and GQ in New Orleans on Saturday, February 2, 2013, at a time when Ms. Upton had not yet turned 21 (which, upon information and belief, did not occur until June 10, 2013.) Upon information and belief, Daimler and/or Mercedes personnel had spread this story to others as well.

96.     According to Day, the purported basis for this story was that Ms. Upton's name was listed as one of the attendees on Paige's $4,000 club bill included in his expense report for that Super Bowl party (the same bill that led to the original assertions by Mercedes, later expressly withdrawn [see ¶ 91 above], that Paige was guilty of excessive spending).  Upon information and belief, Cannon and other senior Mercedes executives, Mercedes HR personnel, and Daimler and BPO personnel involved in the investigation of Paige were the only people at Mercedes or Daimler who were aware of the contents of that club bill, and, therefore, were necessarily the source of the story.

97.     The rumor spread by Mercedes and/or Daimler that Paige had unlawfully served (or been responsible for serving) alcohol to Ms. Upton, a minor, and that his allegedly having done so was the basis for his discharge, was totally false and defamatory.

98.      Although Ms. Upton's name appeared on Paige's club bill (as part of the expenses he was required in practice to assume as alleged above), Paige neither served alcohol to Ms. Upton, nor was responsible for serving alcohol to her, nor brought her into the club where the party took place (at Jax Brewery on Decatur Street in New Orleans). Ms. Upton (who appeared in a Mercedes television commercial that was aired during the 2013 Super Bowl, and was a Mercedes "Brand Ambassador") was part of the overall group that was in attendance at the club, but arrived separately from Paige's own group and had a "club table" near Paige's group. Ms. Upton's presence at the club, and her inclusion (along with other Mercedes guests, and journalists) on Paige's expense report, arose from Mercedes' business association with Ms. Upton in connection with the 2013 Super Bowl weekend (and was the purpose of the group's attending the club in the first place); it had nothing to do with any purported actions by Paige in serving Ms. Upton with alcohol.

99.      Prior to Paige's being informed by Day and Mueller that Mercedes and/or Daimler were disseminating this purported story about him, nobody had ever claimed or even suggested to Paige that he was responsible for serving Ms. Upton with alcohol -- let alone that this was the reason for his discharge. Indeed, during the BPO investigation, Paige explained to the BPO the reasons for Ms. Upton's presence at the club, and the reasons why Paige and various celebrities and journalists were present and spending money. Neither the BPO nor anyone else ever asked Paige to explain why Ms. Upton's name was on his specific expense report, only the magnitude of the total expenses incurred.

100.      Upon information and belief, the defendants fabricated and disseminated this false and defamatory story of Paige's purported unlawful conduct (purportedly resulting in his termination) because they recognized that the actual purported reason for Paige's termination

-- the fact that he was often forced to pick up the check at journalists' events in technical violation of the nominal Mercedes policy requiring the most senior person at a Mercedes event (*i.e.*, Day) to pay the bill, a policy that was generally observed only in the breach -- was an obvious pretext, incredible on its face, and more likely to generate suspicions as to the true reason for Paige's discharge than to quell them.

101.    Accordingly, upon information and belief, the defendants were desperate to fabricate further (albeit equally pretextual) justifications for Paige's discharge, to conceal the true reasons for that discharge (and for the disparate treatment of Paige and Day following Paige's discharge): anti-Semitism, and retaliation by defendants against Paige for his protests concerning the fraud and illegalities surrounding the award of business to Engine Shop and the steering of business to Platinum Rye -- as well as an urgent need for defendants (including Cannon individually) to cover up such improprieties; to portray Paige's complaints as the words of someone lacking in responsibility and credibility, thus hoping to avoid their own exposure to scrutiny by the relevant authorities responsible for monitoring defendants' business.

102.    This was because, during the relevant time hereto, Daimler was under investigation by the U.S. Department of Justice for violating the "1997 Foreign Corrupt Practices Act," for among other things, wrongful conduct, including bribery, in the awarding of lucrative contracts.

103.    Upon information and belief, Daimler paid $185 million in fines and former FBI director Louis Freeh, Esq. was retained by Daimler in 2010, pursuant to a deferred prosecution agreement with the Justice Department, as an independent monitor to oversee the compliance of Daimler and several of its subsidiaries (including Mercedes) with US law, to

prevent them from engaging in corrupt business practices, and to meet with and report to the Justice Department and the SEC, on a regular basis, on the status of such compliance.

104.    The retention of Mr. Freeh was for a three-year term, due to expire in May 2013, and was in effect during the period relevant to this action, until approximately one week after the date of Paige's termination on May 22, 2013. *See* article dated May 30, 2013, entitled "Justice Department Ending Oversight of Daimler," published in *The Detroit Bureau: the Voice of the Automotive World* (retrieved on March 23, 2014 at http://www.thedetroitbureau.com/2013/05/justice-dept-ending-oversight-of-daimler/), stating that "[t]he U.S. Department of Justice is moving to wind up the bribery case it filed against Daimler AG more than three years ago. The DOJ has filed a motion to dismiss the case in Federal Court after being satisfied that the German industrial giant has reformed its internal code of conduct and business practices." A *Wall Street Journal* article dated May 29, 2013 (retrieved on March 23, 2014 at http://blogs.wsj.com/riskandcompliance/2013/05/29/how-daimler-got-a-very-good-report-card/), stated that "[a]lmost a decade after bribery allegations first surfaced at Daimler AG, the auto maker said it's finally built a world-class compliance program designed to keep corruption at bay," in reporting on the positive statements made by Mr. Freeh and Christine Hohmann-Dennhardt (the Daimler board of management member responsible for integrity and legal affairs) at a lunch held in New York City on May 29, 2013 -- one week to the day after Paige's employment was terminated. Upon information and belief, defendants in general, and Cannon in particular, knew that if Paige's complaints concerning the Engine Shop award (or any other allegations of serious continuing wrongdoing) were to come to light, the expiration of the independent compliance monitoring arrangement could be placed in jeopardy.

105.    Moreover, at the outset of the compliance monitoring arrangement in
2010, among other things, "watchdog" positions were created to oversee sales and contract
processes, including the awarding of contracts, as well as other improprieties.  In or about
October 2011, while such monitoring was in effect, Mr. Ernst Lieb, Cannon's predecessor as
Mercedes' CEO, was terminated -- upon information and belief, for reasons including his
allegedly inappropriate use of his company expense account for personal expenditures.  In
addition, at least 30 other Daimler and Mercedes executives were also terminated for various
improprieties during the three-year period after Mr. Freeh's appointment as independent
compliance monitor.  Upon information and belief, Cannon was well aware that his own position
as Mercedes CEO could similarly be in jeopardy if any improprieties on his part were to come to
light.

106.    As alleged above, Paige had direct knowledge and made complaints
concerning wrongdoing, which, if brought to the attention of Mr. Freeh and his staff, could have
had an impact upon such ongoing monitoring and even cause it to be extended beyond its May
2013 expiration date -- including Paige's knowledge of the improper award of a lucrative
marketing contract to Engine Shop (a company with little relevant experience but which had
agreed to employ Carper, Zimmer's close personal friend and Cannon's close associate), an
award which, as detailed above, constituted a fraud on the competing bidders, and, upon
information and belief, involved Carper's conferral of improper inducements and benefits upon
Cannon's friend Zimmer, as well as upon Cannon himself.

107.    Therefore, Paige's continued employment (and continued
"troublemaking" with respect to Engine Shop) represented a potential threat to Daimler and
Mercedes and their management -- and specifically constituted a threat to Cannon's own

personal job security in light of the termination of his predecessor, Ernst Lieb, from his position

because of similar issues and allegations of impropriety and potential corruption.

108.     Under such circumstances, upon information and belief, the purported

investigation by Mercedes and Daimler of "excessive spending" issues, which supposedly

justified plaintiff's termination, was orchestrated by Cannon to ensure that Paige, with his

dangerous knowledge of his superiors' wrongdoing and manipulation of lucrative contract

awards (as well as other wrongdoing as alleged above) would be covered up, that Paige would be

gone from Mercedes, and that Mercedes and Daimler (and their senior executives including

Cannon) would be "protected" from scandal and other adverse consequences (the very purpose

of BPO's existence, as Paige was first informed in the early fall of 2009, during the BPO

investigation of O'Shea's complaints against Day as alleged above).  In Paige's case, those

adverse consequences to defendants included placing Cannon's job in jeopardy, and the possible

postponement of the imminent expiration of Mr. Freeh's term as compliance monitor, thereby

subjecting defendants to continuing direct oversight.

109.     Significantly, as part of this cover-up, and, on information and belief due

to Cannon's intervention and/or with his collusion,  the BPO failed, during the  investigation

which purportedly led to Paige's termination, to raise with Paige the serious issues surrounding

the contract award to Engine Shop, about which illegality Paige had complained to his superior

and to others.  However, despite those complaints and the fact that Paige had substantial

knowledge with respect thereto and that, upon information and belief, the BPO was already

aware of such issues from sources including an anonymous complaint about Engine Shop which

(unbeknownst to Paige at the time) had already been made to the BPO, the BPO was silent on the

illegality issues, a telling and obviously, deliberate omission.  Moreover, when Paige was

interviewed about Engine Shop by house counsel and human resources their silence on the illegality issues is also telling; they inquired only in the most generalized ways about the Engine Shop relationship in a marketing sense; not a word was said about the illegality of the genesis of that relationship.

110.  As demonstrated by all of the foregoing, the investigation of Paige was a frivolous sham and pretext from the outset, whose outcome (Paige's retaliatory discharge on May 22, 2013) was preordained -- and, upon information and belief, was timed by defendants (including Cannon) to coincide almost precisely with the end of Mr. Freeh's status as independent compliance monitor, as reported in the press one week after Paige's discharge.

111.  Upon information and belief, defendants' efforts to cover up the improprieties related to Engine Shop (and the true reasons for Paige's termination) continued after Paige's termination, both through the defamation of Paige as alleged above, and in other respects.

112.  For example, and as part of this cover-up, the BPO's purported investigation of the issues surrounding Engine Shop (*see* ¶ 109 above) has, upon information and belief, resulted in an "internal" resolution designed to avoid publicity and scandal, and otherwise to protect Mercedes in general, and Cannon and Zimmer in particular.  Upon information and belief, the BPO recognized the impropriety of the award of the marketing contract to Engine Shop through Carper's and Zimmer's efforts and the resulting grant to Engine Shop of a monopoly with respect to marketing services at Mercedes events.

113.  As a result, among other things, although Cannon has suffered no adverse consequences, Zimmer has, upon information and belief, been privately disciplined for misbehavior in the form of a "slap on the wrist," on grounds not presently known.  In addition,

upon information and belief, Engine Shop was removed from performing its marketing contract duties in connection with the most recent Fashion Week event, held in February 2014. Moreover, upon information and belief, Carper has been removed as the "face" of Engine Shop with respect to any Mercedes events which Engine Shop still handles.

114.    However, upon information and belief, in order to cover up the true reasons for having taken such actions, Mercedes has disseminated a "story" (which has been conveyed to Paige) that it took such steps against Carper and Engine Shop because Carper improperly hosted non-Mercedes clients of Engine Shop in the Mercedes lounge at the spring Fashion Week held in September 2013.

115.    Upon information and belief, whether or not Carper actually was guilty of such conduct, the story disseminated by Mercedes (as with the defamatory Kate Upton story disseminated about Paige in order to cover up the true reasons for his termination) was not the true reason for the steps it took against Carper and Engine Shop, but was spread by Mercedes as part of its attempt to protect the company (and Cannon) by covering up the serious improprieties, involving fraudulent and illegal conduct, surrounding the award of the marketing contract to Engine Shop.

### COUNT ONE (CEPA)
### (Against All Defendants)

116.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "17," "22," and "27" through "115" and incorporates them by reference as if fully set forth herein.

117.    Defendants Mercedes, Daimler, and Cannon are all "employers" within the meaning of CEPA, N.J.S.A. 34:19-2(a), which defines "employer" to mean, *inter alia*, "any

individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent."

118.    Upon information belief, at all times relevant herein, the retaliatory actions taken towards Paige by or at the direction of Daimler (through its BPO) and Cannon, as well as their other actions alleged herein, were undertaken while they were acting directly or indirectly on behalf of or in the interest of Mercedes, with Mercedes' consent and authorization.

119.    During the course of his employment, plaintiff became aware of improper conduct by Mercedes employees and/or agents as alleged above, including but not limited to, the awarding of a marketing contract to Engine Shop, an unqualified vendor with close personal ties to Mercedes' management, through a corrupt and "rigged" bidding process, and objected to such wrongful activities which he reasonably believed were in violation of the law, or a rule or regulation promulgated pursuant to law, or that were fraudulent or criminal (including but not limited to, wrongdoing that violated the New Jersey Commercial Bribery Act, N.J.S.A. 2C:21-10(a)), and disclosed such wrongful activities to his supervisor and to other members of Mercedes management, who, in turn, disclosed plaintiff's protests and complaints to Mercedes' CEO and President and to Daimler's BPO.

120.    On May 22, 2013, defendants took retaliatory action against the plaintiff within the meaning of CEPA by terminating plaintiff's employment in retaliation for and to prevent his further complaints about Zimmer, Carper, Cannon, Engine Shop and Platinum Rye, and to stifle such complaints as above detailed.

121.    The internal investigation purportedly undertaken by Mercedes and Daimler, with Cannon's knowledge and participation, and (in whole or in part) at his direction, was nothing more than a "pretext" used to justify the retaliatory firing of plaintiff and protect

management (including Cannon), as well as to curtail the possibility that plaintiff's knowledge of suspect business practices on the part of Mercedes management (and the BPO) would be made public and/or brought to the attention of Louis Freeh, the independent compliance monitor appointed by Daimler in 2010 in connection with Daimler's deferred prosecution agreement with the U.S. Department of Justice, before the monitoring arrangement expired at the end of May 2013.

122.    As a direct and proximate cause of the above actions, plaintiff's rights under CEPA were violated and he has been caused to suffer severe and permanent injuries, losses and damages, including but not limited to emotional distress and mental anguish, humiliation, and economic losses including but not limited to lost wages, lost benefits and other losses and damages, all arising from defendants' retaliation against him for doing his job honestly and effectively.

### COUNT TWO (NJLAD)
### (Against Mercedes)

123.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "17," "18 through "30," "93-94" and "101," and incorporates them by reference as if fully set forth herein.

124.    Plaintiff is of Jewish faith and ancestry.

125.    By and through the course of conduct as alleged herein, defendant Mercedes and its employees Day, Zimmer, and Cannon, discriminated against plaintiff Paige by virtue of his religion and ancestry in violation of NJLAD.

126.    Defendants intentionally and maliciously subjected plaintiff to pervasive, continuous humiliation and harassment based on his religion and ancestry which was performed,

witnessed, acquiesced to and condoned by defendant Mercedes and/or its employees including Cannon, Day and Zimmer.

127. Defendant Mercedes maliciously and deliberately failed reasonably to accommodate plaintiff's religious practices and observances, which accommodation would not have placed an unreasonable burden on the defendants.

128. Plaintiff's termination was based, in reality, in whole or in part, on plaintiff's Jewish faith and ancestry.

129. Defendants had no legitimate, non-discriminatory reason for their actions.

130. As a direct and proximate result of Mercedes' discriminatory conduct, Plaintiff has suffered embarrassment, humiliation, emotional distress and mental anguish, injury to his professional reputation, and has been caused to suffer damages and will in the future continue to do so.

## COUNT THREE (Defamation)
## (Against All Defendants)

131. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "17" and "31" through "101," and incorporates them by reference as if fully set forth herein.

132. After the investigation conducted by Mercedes and Daimler was concluded and plaintiff's employment had been terminated, defendants' actions, including, but not limited to, the publication to various persons (including Day and Mueller) of false allegations of improper conduct attributable to plaintiff -- specifically, the false allegations that Paige served or was responsible for serving alcohol to a minor, the model and actress Kate Upton, at a pre-Super Bowl party held in New Orleans on or about February 2, 2013, and that this purported (but actually non-existent) occurrence was the ostensible reason for plaintiff's termination (*see* ¶¶ 95-

101, above) -- constitute defamation against plaintiff's character and reputation, in the form of slander.

133. By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment in this Court against defendants as follows:

a) With respect to Count I, against all defendants, jointly and severally, damages, including but not limited to compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, costs of suit and attorneys' fees to the extent permitted by statute;

b) With respect to Count II against Mercedes, damages, including but limited to, compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, costs of suit and attorneys' fees to the extent permitted by statute;

c) With respect to Count III, against all defendants, jointly and severally, damages, including but not limited to compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, costs of suit, reasonable attorney's fees; and

d) Such other, further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all causes so triable.

Dated: July 16, 2014

WARSHAW BURSTEIN, LLP

By: _____

Paul A. Lieberman, Esq.